*In re* CÉSAR ANDRÉU RIBAS, querellado.

Número 95.

*Sometido:* 25 de abril de 1958. *Resuelto:* 12 de marzo de 1959.

*Hon. Secretario de Justicia J. B. Fernández Badillo* por sí y representado además por los *Fiscales Especiales Generales José C. Aponte* y *Guillermo A. Gil; Félix Ochoteco, Jr., Jorge L. Córdova Díaz, Gabriel de la Haba, Benicio Sánchez Castaño* y *Manuel García Cabrera,* abogados del querellado.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ MATOS emitió la opinión del Tribunal.

El Secretario de Justicia, Sr. Juan B. Fernández Badillo, por sí y representado además por los Fiscales Especiales Generales señores José C. Aponte y Guillermo A. Gil, presentó en este Tribunal, el día 20 de febrero del pasado año, querella de desaforo contra el abogado César Andréu Ribas, formulando en la misma los siguientes cargos contra el querellado:

## "Primer Cargo

"Que con fecha 25 de marzo de 1957 y en el ejercicio de su profesión de abogado, el querellado César Andréu Ribas radicó en la Secretaría del Tribunal Superior de Puerto Rico, Sala de Bayamón, en el caso de El Pueblo de Puerto Rico contra Miguel Ángel Marín Canals, criminal número M–56–251, por Infracción al Artículo 6 de la Ley de Armas de Puerto Rico, una moción fechada 21 de marzo de 1957 y titulada 'Solicitud de Enmiendas a la Transcripción de la Evidencia' que copiada literalmente dice así:

" 'Comparece ahora el acusado por su abogado que suscribe y expone:

" '1. Que recibió copia de la transcripción de la evidencia preparada, certificada y radicada por el taquígrafo-repórter, Sr. Juan Amaral, y encontrándose pendiente de aprobación por parte de este Tribunal a los efectos de perfeccionar la apelación interpuesta contra la sentencia dictada por el Tribunal de derecho, el acusado somete la siguiente enmienda:—

" '1. Al terminar de presentar su prueba el Fiscal Grajales y luego de haber declarado los policías Aureliano Díaz y Manuel Ralat, el Juez Fernando Gallardo, preguntó al Fiscal Grajales:

" '¿Esa es toda la prueba?' y al Fiscal contestarle afirmativamente, el Juez ordenó al Marshal sacara al Jurado de Sala, y se desarrolló un extenso diálogo entre el Juez y el Fiscal más o menos en los siguientes términos:

" 'Sr. Juez: ¿Usted me quiere decir que habiendo sucedido este caso en una barra ahí en Cataño, que está a dos minutos de aquí, usted tan sólo trae a declarar a los dos policías, y que usted no le ha tomado declaración ni al dueño de la barra, o encargado de la misma, ni a ningún otro ciudadano? Fíjese que yo tengo la responsabilidad de resolver uno de estos dos casos, que son felony uno y el otro misdemeanor, y esa investigación es muy deficiente. Yo cuando era Fiscal en Guayama y en San Juan y se daba un caso como éste no me conformaba con lo que me dijera la policía, sino que me iba al sitio, le cogía declaración a todos los testigos y a cuanta persona pudiera haber estado presente, aunque fuera para decirme que no sabía nada del asunto. Así no me podía la defensa traer esos testigos a decir que vieron esto y aquello otro porque ya yo los tenía amarrados con una declaración de que no sabían nada.

" '*Fiscal Grajales:* Esa es toda la prueba que tiene el Pueblo, y ese es el caso; yo no puedo hacer nada más.

" '*Sr. Juez:* Pues mire, ahora el acusado trae al Administrador de ese negocio y a otros ciudadanos que presenciaron el arresto, los tiene ahí afuera de testigos y El Pueblo ha podido investigarlos antes. Receso.'

" '2. Que estas manifestaciones fueron dichas en el curso del juicio por el magistrado y por el Fiscal; forman parte de lo que ocurrió y debe ser transcrito íntegramente y ha sido eliminado indebidamente, y ello debe ser intercalado en el sitio indicado de la transcripción de la evidencia.

" '3. Que durante el receso el abogado del acusado se acercó al Sr. Amaral, y luego en la propia oficina de éste, consiguió que se le leyeran las manifestaciones que ahora no aparecen de la transcripción, razón por la cual, tiene motivos para creer que no ha sido, ni se trata de una omisión involuntaria al transcribir sus notas sino que esas frases fueron eliminadas de la transcripción luego de conocerse por el Tribunal de la intención de apelar que manifestó el acusado en corte abierta al solicitar se le fijara fianza para hacerlo.

" 'Por lo expuesto, el acusado suplica de este tribunal se sirva ordenar que por el taquígrafo-repórter, Sr. Juan Amaral, se proceda a intercalar en el sitio que corresponde en la transcripción de la evidencia (página 48, antes de que se recesara para ir a almorzar y luego de haberse presentado en evidencia, sin objeción del acusado, la pistola y las balas) todas las palabras, frases y manifestaciones antes transcritas y propuestas como enmiendas por el acusado, y que fueron dichas en corte abierta, en el transcurso del juicio por el Juez Fernando Gallardo Díaz dirigidas al Fiscal Grajales y las dichas por éste, de manera que la transcripción vaya completa a la consideración del Hon. Tribunal Supremo de Puerto Rico a lo cual tiene derecho el acusado.

" 'San Juan, Puerto Rico, a 21 de marzo de 1957.    (fdo) C. Andréu Ribas, Abogado del acusado-apelante.

" 'NOTIFICACIÓN POR CORREO

" 'Certifico que he enviado copia de esta moción al Fiscal de Distrito (Auxiliar) Lcdo. Fdo. Grajales Ortiz, a su oficina en Tribunal Superior de Puerto Rico, Sala de Bayamón, hoy a 21

de marzo de 1957.    (fdo) C. Andréu Ribas.—C. Andréu Ribas.—
Tribunal Superior de P. R. Sala de Bayamón.   Iniciado: Francisco Vázquez Ríos.—1957 MAR 25 PM 4:46. Sec. de Bayamón.' "

"Que al redactar y radicar la Solicitud que se deja transcrita, el querellado observó una conducta inmoral e impropia de un abogado consistente en que en el párrafo 3 de la misma hizo la imputación velada de que, luego de conocerse por el Tribunal de la intención del acusado de apelar, hubo connivencia entre el Tribunal y el taquígrafo, Sr. Juan Amaral, para eliminar, como se eliminó de la transcripción de la evidencia, un incidente ocurrido, durante la vista del caso, entre el Juez Gallardo y el Fiscal Fernando Grajales con el alegado propósito malicioso de privar al acusado del derecho de invocar como fundamento de error en la apelación las frases pronunciadas por el Juez Gallardo en dicho incidente sobre la calidad de la prueba de cargo; que la mencionada imputación es falsa y fue hecha por el abogado querellado sin que le constase su certeza y sin tener causa probable o fundamento alguno para creer en la verdad de la misma, y con la intención maliciosa de menoscabar la honradez e integridad del Tribunal y del Juez, Sr. Gallardo, todo ello en violación de los deberes que el querellado, como abogado, tenía para con dicho Tribunal y Juez.

"SEGUNDO CARGO

"Que el día 3 de mayo de 1957 mientras el querellado César Andréu Ribas, ejercía su profesión de abogado representando al acusado en la vista de una Solicitud de Enmiendas a la Transcripción de la Evidencia radicada por el querellado en la causa criminal número M–56–251 titulada 'El Pueblo de Puerto Rico contra Miguel Ángel Marín Canals', por Infracción al Artículo 6 de la Ley de Armas de Puerto Rico en el Tribunal Superior de Puerto Rico, Sala de Bayamón, el querellado observó, en la Sala de Sesiones de dicho Tribunal, una conducta inmoral e impropia de un abogado y en detrimento del prestigio, la dignidad y el buen nombre del Tribunal y de la administración de la justicia consistente en que al llamarle la atención el Magistrado que presidía la Sala, Hon. Fernando Gallardo Díaz, sobre la forma en que el querellado había redactado la referida Solicitud de Enmiendas y antes de que el Juez pudiera referirse a la imputación contenida en la misma y a la cual se refiere el cargo anterior, el querellado lo interrumpió en actitud desdeñosa e insolente pro-

duciéndose entonces entre el querellado y el Juez un cambio de palabras, dichas en tono y actitud desafiantes como resultado del cual el Juez bajó violentamente de estrados, haciendo uso ambos de lenguaje obsceno y ofensivo en alta voz, promoviéndose el consiguiente desorden e interrumpiéndose así los procedimientos del Tribunal habiendo tenido que intervenir varios abogados y funcionarios del Tribunal para evitar agresiones físicas entre ambos."

Suplicó el querellante que se decretara la separación permanente del abogado César Andréu Ribás de su profesión de abogado o en su defecto que se le aplicara la sanción disciplinaria o correctiva que este Tribunal creyera más adecuada bajo las circunstancias concurrentes.

Representado por los letrados señores Félix Ochoteco, Jr., Benicio Sánchez Castaño, Manuel García Cabrera, Jorge L. Córdova Díaz y Gabriel de la Haba, el querellado contestó la querella alegando lo que pasamos a transcribir:

### "RÉPLICA AL PRIMER CARGO

"1. Acepta el querellado haber redactado y radicado en la fecha, en el Tribunal y en la causa a que se contrae la querella de epígrafe, la 'Solicitud de Enmiendas a la Transcripción de Evidencia' transcrita en el Primer Cargo.

"2. El querellado, al consignar, como consignó, en el apartado 3 de la citada 'Solicitud de Enmiendas a la Transcripción de la Evidencia', que tenía motivos para creer que la omisión del incidente a que se contrae el apartado primero de dicha Solicitud no había sido una omisión involuntaria al transcribir sus notas el taquígrafo, y sí que dicho incidente fue eliminado de la citada transcripción, luego de conocerse por el Tribunal la intención de apelar del acusado manifestada en corte abierta, y luego de solicitar fijación de fianza, alega el querellado que tenía fundados motivos para creer como creyó de buena fe, que tal involuntaria omisión tuvo lugar no a iniciativa del taquígrafo, Sr. Juan Amaral, basando el querellado dichos fundados motivos, en los siguientes hechos:

"(A) Por haberle manifestado al querellado el citado taquígrafo, Sr. Juan Amaral, el 25 de enero de 1957, inmediatamente después de haberse dictado la sentencia apelada y en ocasión de

haber el querellado entrevistado al mismo, y luego de haberle leído éste al querellado de las notas taquigráficas del juicio el citado incidente, y haber el abogado deponente cotejado con el Sr. Amaral dicha lectura con las notas tomadas por el compareciente durante el juicio, que el referido taquígrafo no podía asegurarle al compareciente que el citado incidente, luego omitido, iba a aparecer en la transcripción de evidencia, toda vez que tenía el taquígrafo instrucciones del juez de dicho tribunal, que con anterioridad a él notificar a las partes con copias de transcripciones de evidencia solicitadas en casos apelados, primero se las sometiera a su consideración para su revisión.

"(B) Porque para poder incurrir en tal eliminación de dicho incidente el citado taquígrafo tuvo que saltar u omitir de transcribir no menos de catorce páginas de signos taquigráficos, que a su vez representan las cinco páginas de transcripción que comprende el incidente en cuestión, lo que llevó al querellado a concluir de buena fe, que no se trataba meramente de una omisión por error clerical.

"(C) Porque para cualquier abogado de la experiencia del querellado, con un ejercicio profesional de veintidós años, tenía que resultarle como le resultó, significativo, que precisamente lo que se omitía por el taquígrafo en dicha transcripción era el único incidente durante el juicio que favorecía la contención del acusado en cuanto a su inocencia, y con vista al recurso de apelación establecido por él, toda vez que dicho incidente se refería a las manifestaciones del magistrado que presidió el juicio hechas una vez terminada la prueba de El Pueblo, a virtud de las cuales calificó dicha prueba de insuficiente, y recriminando al Ministerio Público por no haber éste procurado aportar mejor prueba.

"(D) Porque al tener la convicción moral el querellado de que no se trataba de una omisión involuntaria por parte del taquígrafo, y sí de una eliminación exprofesa, y además por considerar el querellado que dicho taquígrafo no tenía interés en la resultancia del recurso apelativo.

"(E) Porque teniendo conocimiento, como tenía el querellado desde hacía por lo menos veinte años, que el Sr. Juan Amaral era un taquígrafo de 'récord' de absoluta competencia por su experiencia como tal de más de veinticinco años, el querellado sólo podía llegar a la conclusión, como llegó de buena fe, que tal omisión no era una mera inadvertencia o error del citado taquí-

grafo, y sí una omisión voluntaria de parte esencial de un récord taquigráfico.

"3. Que no obstante el querellado y por los fundamentos anteriormente consignados, haber creído de buena fe, como creyó, que tal omisión había sido una no clerical y por tanto, no involuntaria, el compareciente, en sus deseos de hacer dicho planteamiento de tal omisión en la forma más discreta posible, pero sin faltar a su deber profesional para con su defendido, sólo se limitó a alegar en dicho párrafo tercero de la referida 'Solicitud de Enmiendas a la Transcripción de Evidencia', que el querellado . . . 'tiene motivos para creer que no ha sido, ni se trata de una omisión involuntaria al transcribir sus notas sino que esas frases fueron eliminadas de la transcripción luego de conocerse por el Tribunal de la intención de apelar que manifestó el acusado en corte abierta al solicitar se le fijara fianza para hacerlo', y todo ello inspirado el querellado en su propósito de que el Tribunal procediera, no sólo a ordenar la inclusión del incidente omitido, y sí también a investigar el motivo de tal omisión.

## "RÉPLICA AL SEGUNDO CARGO

"4. Acepta el querellado que el día 3 de mayo de 1957, y durante la vista de la 'Solicitud de Enmiendas a la Transcripción de Evidencia' a que se refiere el Primer Cargo, tuvo lugar en el Tribunal Superior de Puerto Rico, Sala de Bayamón, un incidente entre el juez que presidió dicha vista y el querellado como abogado del allí acusado Miguel Ángel Marín Canals, y acepta además el querellado, que como consecuencia de dicho incidente, se promovió el correspondiente desorden, interrumpiéndose los procedimientos de aquel tribunal; pero alega el querellado que dicho incidente fue originado e iniciado sin justificación alguna por el propio juez que presidía la citada vista, y sin culpa alguna del compareciente, al proceder allí y entonces dicho juez a ofender, provocar, desafiar, y humillar de palabras y con gestos al querellado, en actitud de acometerle y agredirle en presencia de numerosos abogados postulantes y de un nutrido público que asistían a la sesión del Tribunal, limitándose el querellado a responder las ofensas, provocaciones, desafíos y humillaciones de que había sido víctima por parte del citado magistrado.

"5. Que en consideración a lo expuesto en el apartado cuarto supra, niega el querellado que con motivo del citado incidente él

observara una conducta inmoral e impropia ante el Tribunal Superior de Puerto Rico, Sala de Bayamón, ya que el sólo se limitó, y según lo anteriormente consignado, a contestar las ofensas, provocaciones, desafío y humillación que de palabras y gestos le hiciera al querellado allí y entonces el juez que actuó en dicha vista, ofensas, provocaciones y desafíos que reiteró e hizo publicar dicho magistrado en entrevista con el redactor, Sr. Víctor M. Padilla de 'El Mundo', edición del martes 7 de mayo de 1957, al manifestar entre otras cosas lo siguiente: 'No voy con quejas contra él ante ningún tribunal, ni ante un Comité de Quejas del Colegio de Abogados. Los hombres actúan en otra forma.'

"6. Niega el querellado que dicho incidente tuviera lugar antes de que el citado magistrado pudiera referirse a las alegaciones contenidas en dicho tercer párrafo de la 'Solicitud de Enmiendas a la Transcripción de Evidencia', al que se ha hecho referencia, y por el contrario alega el querellado, que tal incidente sólo se debió al resentimiento infundado del citado magistrado al observar, que en la expresada 'Solicitud de Enmiendas a la Transcripción de Evidencia' el querellado sólo se limitaba a llamarle 'Señor Juez', y no 'Honorable Juez', alegando el querellado, que tal omisión por parte de él de tal calificativo, en forma alguna constituyó motivo o excusa para que dicho magistrado provocara y originara dicho incidente, y para que ofendiera, maltratara, desafiara y humillara al querellado de palabras y gestos, como así lo hiciera el referido magistrado.

"7. Alega el querellado, además, que dicho incidente fue provocado por el citado magistrado movido exclusivamente por la aprehensión que el mismo en todo momento ha tenido contra el querellado debido a las relaciones de abierta enemistad o resentimiento que han existido por parte del juez que presidió dicho juicio contra el querellado, resentimiento éste que siempre ha existido y existió desde hace varios años teniendo motivo el querellado para creer de buena fe que ese resentimiento se recrudeció cuando, poco antes de celebrarse el juicio en las causas de El Pueblo vs. Miguel Ángel Marín Canals, el querellado asumió, con conocimiento de dicho magistrado, la defensa de una dama casada con un hermano del citado juez, habiendo obtenido por su intervención profesional el querellado para su cliente más de $140,000 que tuvo que pagarle el expresado her-

mano del juez en el aludido pleito y por concepto de la liquidación de la sociedad de gananciales. (Caso Civil Núm. 54–1100 del Tribunal Superior de Puerto Rico, Sala de San Juan.)

## "DEFENSAS ESPECIALES COMUNES A AMBOS CARGOS

"I—Que dicha querella no aduce hechos suficientes en ninguno de sus dos Cargos, que justifiquen la solicitud del Honorable Secretario de Justicia del Estado Libre Asociado de Puerto Rico para que el querellado sea separado del ejercicio de su profesión por este Honorable Tribunal.

"II—Que en ningún momento la conducta observada por el querellado en relación con los dos incidentes a que se contraen los dos Cargos de la querella, fue una conducta inmoral e impropia, y por el contrario alega el querellado, que tal conducta en toda ocasión se atemperó a la ética profesional y al ejercicio del querellado en sus derechos como abogado postulante, por lo que, estima éste, que no procede se le aplique sanción disciplinaria alguna por este Honorable Tribunal.

"III—El querellado consigna que durante sus veintidós años de práctica profesional cotidiana jamás se ha radicado contra él queja o querella alguna disciplinaria ante este Honorable Tribunal Supremo, ni ante la Honorable Corte de Distrito de los Estados Unidos para el Distrito de Puerto Rico, ni ante el Honorable Secretario de Justicia, ni ante el Colegio de Abogados de Puerto Rico, ni tampoco jamás ha tenido que responder por procedimiento de desacato en el ejercicio de su profesión, gozando el compareciente entre la magistratura de una reputación intachable, al igual que entre sus compañeros del foro y en la comunidad.

"POR TODO LO EXPUESTO, el querellado respetuosamente suplica se desestime la querella de autos en todos sus particulares."

La vista para la consideración de dichos cargos fue celebrada durante los días 26, 27 y 28 de marzo de 1958 constituído este Tribunal en pleno con excepción de los Jueces Asociados Sres. Pérez Pimentel y Saldaña, quienes no intervinieron. Ambas partes presentaron evidencia testifical y documental.(¹) Se les concedió término para presentar,

(¹) De la prueba practicada en la vista del procedimiento sobre destitución contra el Juez Superior Fernando Gallardo Díaz, por estipulación oral hecha al comienzo de la vista del presente caso de desaforo, el aquí

como presentaron, alegatos escritos, quedando el asunto sometido para su resolución.

Ordena la ley—4 L.P.R.A. sec. 739—que si después de la debida consideración a las pruebas presentadas por ambas partes, el Tribunal Supremo llegase a la conclusión que la querella, o cualquier parte sustancial de la misma, es cierta, dictará una orden para la remoción o suspensión de la parte querellada, según la gravedad de los cargos y ordenará, además, que se borre el nombre del ofensor del registro de abogados, y a los efectos de cumplir ese deber hicimos un cuidadoso análisis y examen de la evidencia presentada por cada parte y un detenido estudio de sus alegatos. Considerando el crédito que cada testigo nos ha merecido y el valor probatorio de cada pieza documental, hemos llegado a las siguientes

## Conclusiones Sobre los Hechos
### Primer Cargo

1. El querellado fue admitido al ejercicio de la profesión de abogado por este Tribunal en 15 de junio de 1936, y a ejer-

querellante ofreció y fueron admitidos como prueba suya: los Exhibits números 3, 4, 5, 6, 7, 8, 9, 10 y 19 de la parte allí querellante y los marcados A, B, E, F, G, I, J, K, M y N del juez querellado, y, también, los testimonios allí prestados por Humberto Álvarez, José J. Acosta, Demetrio Luis Latoni, Fausto Ramos Quirós, Luis A. Archilla Laugier (como testigo del allí querellante), José L. Feliú Pesquera, Carlos I. Borges López, Rafael A. Pesquera, Octavio Malavé Torres, Juan Ramón Rivera Ayala, Manuel Menéndez Pesquera, Leandro Miranda Torres, Ana Delia Torres (en parte), Juan Amaral (su primer testimonio), Fernando Grajales Rodríguez y Fernando Gallardo Díaz. Del mismo caso, el abogado aquí querellado, ofreció y fueron admitidos como prueba suya, en virtud de la misma estipulación: los Exhibits números 11, 12, 13, 14, 15, 17 y 18 del allí querellante y los marcados "C" y "O" presentados por el juez querellado y, además, los testimonios prestados en aquel procedimiento por César Andréu Ribas, Antonio Cortés Ostalaza, Ernesto Juan Fonfrías, José C. Jusino, Víctor Manuel Padilla, Rafael Rodríguez Emma, Armando Santini, Manuel Torres Reyes, Joaquín Correa Suárez, Francisco Ponsa Feliú y Juan Amaral (segunda declaración).

En el curso de la presente opinión, al referirnos a los exhibits o páginas del récord taquigráfico de aquel procedimiento sobre destitución, añadiremos a su correspondiente letra o número las letras "GD". Cuando determinados letra o números no estén seguidos por esas dos letras "GD" se entenderá que hacemos referencia a, o citamos de los exhibits admitidos por primera vez en este caso de desaforo o al récord taquigráfico del mismo.

cer el Notariado en 24 de junio del mismo año.    Exh. 1, Querellante.

2. Ante la Sala de Bayamón del Tribunal Superior se radicaron en el mes de octubre de 1956 dos acusaciones contra Miguel Ángel Marín Canals por infracciones a la Ley de Armas.    La primera, de carácter grave, bajo el núm. G–56–198, en relación con el art. 8 de dicha ley.    La segunda, menos grave, bajo el núm. M–56–251, por infracción al art. 6, consistente en haber tenido en su posesión una pistola sin haber obtenido previamente una licencia expedida por el Jefe de la Policía de Puerto Rico.    Las causas fueron sometidas conjuntamente a juicio presidido por el Juez Superior Fernando Gallardo Díaz en los días 24 y 25 de enero de 1957, representando a El Pueblo el fiscal Fernando Grajales y al acusado el abogado querellado César Andréu Ribas y el Lic. Gilberto Padró Díaz.    En la grave, núm. G–56–198, juzgada por un jurado, el veredicto fue absolutorio.    La menos grave, núm. M–56–251, fue decidida por dicho juez, quien declaró al acusado Marín Canals culpable y lo condenó a cumplir una pena de seis meses de cárcel.—Exhibits 3GD y 4GD, Querellante.

3. En el curso del juicio, y en la tarde de su primer día, ocurrió lo que sigue:

"La Corte: ¿En este caso no había más gente por allí?    Yo tengo que resolver el otro asunto.    Allí había muchísima gente y el fiscal se limitó a coger declaraciones a los dos policías.

"Hon. Fiscal: Nosotros tenemos a los dos policías y además investigamos.    He hecho gestiones para conseguir otros testigos.

"La Corte: El fiscal debe suponer que un caso que ocurre en una hora temprana de la noche y cuando hay mucha gente, tiene que adelantar que la defensa le va a decir al jurado '¿señores cómo es posible que este asunto que ocurrió en un sitio público y los únicos testigos que traen los fiscales son los dos guardias habiendo tanto testigo en ese negocio?'

"Su señoría (dirigiéndose al fiscal) pudo haber investigado a los que estaban en el negocio.    Pudo hacerles preguntas de si vieron algo.    Si dicen que no vieron nada, por ejemplo, ponerlo por escrito, que no saben nada y en esas circunstancias en un caso

como éste después no pueden venir a la corte si declararon que no vieron nada a decir que vieron . . . Si es posible. A un ciudadano diga la verdad de lo que vio. Si es posible y eso les bastará. Pero los casos no se pueden llevar en esa forma.

"Hon. Fiscal: Nosotros, señor Juez, decimos que se pueden llevar con un testigo policía.

"La Corte: Se pueden llevar, pero el que va a juzgar tiene que conocer eso.

"Hon. Fiscal: Nosotros hicimos todas las gestiones pertinentes.

"La Corte: No puede dejarse eso. Si alguien le dijo que no sabía . . .

"Hon. Fiscal: Les pregunté a todos los testigos durante las investigaciones y al acusado quien no quiso declarar . . .

"La Corte: Es un derecho que él tiene.

"Hon. Fiscal: . . . Ni El Cano, se le preguntó y en ningún momento dijo haber visto nada de eso.

"La Corte: ¿Por qué no lo escribió? Si fue a la fiscalía yo le cojo una declaración y lo tengo amarrado.

"Hon. Fiscal: Si El Cano no estuvo en fiscalía en seguida. Eso fue un mes o mes y pico después de verse con el propio acusado, que este señor acusado quería que se le tomara esa declaración. Pero este señor acusado quería que se le tomara esa declaración. Pero este caso ocurrió en octubre 7, pues el 7 o el día 8 se investigó el caso.

"La Corte: Se hace venir a todo el mundo. Yo tomaba 60 declaraciones para utilizar 3. Yo lo sabía: lo ponía.

"Defensa: Yo voy a pedir que se eliminen las manifestaciones del fiscal con relación a que El Cano fue a su oficina.

"Hon. Fiscal: Yo retiro todo lo que dije.

"La Corte: El jurado no está aquí ahora.

"Defensa: Vuestro honor en esta misma semana desmintieron al compañero Grajales. Como lo que está diciendo es de memoria no quiero que conste en récord eso.

"Hon. Fiscal: Bueno . . . Yo retiro . . .

"La Corte: ¿Qué va a retirar?

"Hon. Fiscal: . . . Todo lo que dijo cuando estuvo en mi oficina.

"La Corte: Traiga el jurado márshal. El jurado está completo y es el mismo. El acusado está presente y los abogados.

Traiga un testigo. Que venga el testigo que estaba declarando. Puede seguir la defensa preguntándole." (Exh. 7 GD, Querellante.)

4. Contra la sentencia condenatoria interpuso recurso de apelación el acusado y, en la misma fecha, 25 de enero de 1957, solicitó del tribunal que se ordenara la preparación de la transcripción de las notas taquigráficas tomadas en el curso del juicio. Así lo ordenó el tribunal el 29 de enero, notificándose de ello a Juan Amaral, taquígrafo que actuó en la vista de los casos.—Folios 8 y 9, Exh. 3 GD, Querellante.

5. En 7 de marzo de 1957 radicó el taquígrafo Amaral una transcripción de evidencia, señalándose finalmente la vista para su aprobación, luego de varias suspensiones, para el 3 de mayo siguiente.—Folios 14, 15, 16, 21, 22 y 23, Exh. 3 GD, Querellante.

6. El 25 de marzo, el abogado querellado César Andréu Ribas, en representación del acusado Marín Canals, presentó en la secretaría del Tribunal Superior, Sala de Bayamón, un escrito cuyo texto literal es el siguiente:

"En el Tribunal Superior de Puerto Rico, Sala de Bayamón. —El Pueblo de Puerto Rico, vs. Miguel Ángel Marín Canals, acusado.—Crim. Núm. C–56–198 M–56–251 Por: Inf. Ley de Armas (Felony) (Misd.) *Solicitud de Enmiendas a la Transcripción de la Evidencia.* Comparece ahora el acusado por su abogado que suscribe y expone: 1.—Que recibió copia de la transcripción de la evidencia preparada, certificada y radicada por el taquígrafo-repórter, Sr. Juan Amaral, y encontrándose pendiente de aprobación por parte de este tribunal, a los efectos de perfeccionar la apelación interpuesta contra la sentencia dictada por el tribunal de derecho, el acusado somete la siguiente enmienda: 1.—Al terminar de presentar su prueba el Fiscal Grajales y luego de haber declarado los policías Aureliano Díaz y Manuel Ralat, el Juez Fernando Gallardo, preguntó al Fiscal Grajales: '¿Ésa es toda la prueba?' y al Fiscal contestarle afirmativamente, el Juez ordenó al Márshal sacara al Jurado de Sala, y se desarrolló un extenso diálogo entre el Juez y el Fiscal más o menos en los siguientes términos:

"Sr. Juez: ¿Usted me quiere decir que habiendo sucedido este caso en una barra ahí en Cataño, que está a dos minutos de aquí, usted tan sólo trae a declarar a los dos policías, y que usted no le ha tomado declaración ni al dueño de la barra, o encargado de la misma, ni a ningún otro ciudadano? Fíjese que yo tengo la responsabilidad de resolver uno de estos dos casos, que son felony uno y el otro misdemeanor, y esa investigación es muy deficiente. Yo cuando era Fiscal en Guayama y en San Juan y se daba un caso como éste no me conformaba con lo que me dijera la policía, sino que me iba al sitio, le cogía declaración a todos los testigos y a cuanta persona pudiera haber estado presente, aunque fuera para decirme que no sabían nada del asunto. Así no me podía la defensa traer esos testigos a decir que vieron esto y aquello otro porque ya yo los tenía amarrados con una declaración de que no sabían nada.

"Fiscal Grajales: Ésa es toda la prueba que tiene el Pueblo, y ése es el caso; yo no puedo hacer nada más.

"Sr. Juez: Pues mire, ahora el acusado trae al administrador de ese negocio y a otros ciudadanos que presenciaron el arresto, los tiene ahí afuera de testigos y El Pueblo ha podido investigarlos antes. Receso.

"2.—Que estas manifestaciones fueron dichas en el curso del juicio por el magistrado y por el Fiscal; forman parte de lo que ocurrió y debe ser transcrito íntegramente y ha sido eliminado indebidamente, y ello debe ser intercalado en el sitio indicado de la transcripción de la evidencia.

"3.—Que durante el receso el abogado del acusado se acercó al Sr. Amaral, y luego en la propia oficina de éste, consiguió que se le leyeran las manifestaciones que ahora no aparecen de la transcripción, razón por la cual, *tiene motivos para creer que no ha sido, ni se trata de una omisión involuntaria al transcribir sus notas sino que esas frases fueron eliminadas de la transcripción luego de conocerse por el tribunal de la intención de apelar que manifestó el acusado en corte abierta, al solicitar se le fijara fianza para hacerlo.* Por lo expuesto, el acusado suplica de este tribunal se sirva ordenar que por el taquígrafo-repórter, Sr. Juan Amaral, se proceda a intercalar en el sitio que corresponde en la transcripción de la evidencia (página 48, antes de que se recesara para ir a almorzar y luego de haberse **presentado en evidencia, sin objeción del acusado, la pistola y**

las balas) todas las palabras, frases y manifestaciones antes transcritas y propuestas como enmiendas por el acusado, y que fueron dichas en corte abierta, en el transcurso del juicio por el Juez Fernando Gallardo Díaz dirigidas al Fiscal Grajales y las dichas por éste, de manera que la transcripción vaya completa a la consideración del Hon. Tribunal Supremo de Puerto Rico, a lo cual tiene derecho el acusado.—San Juan, Puerto Rico, a 21 de marzo de 1957. (Firmado) C. Andréu Ribas, abogado del acusado apelante." (El subrayado parcial del párrafo 3 fue hecho por el juez querellado, con un lápiz azul, "el lunes o martes después del incidente . . . en la Secretaría del Tribunal." R. 1106 GD.) Folios 18–20, Exh. 3 GD, Querellante.

7. Copia de la anterior moción fue enviada al fiscal Grajales. Pocos días después, y en ocasión en que el taquígrafo Amaral visitaba la oficina del fiscal, éste le dio a leer la mencionada copia. El récord—págs. 401–402 GD—narra lo que luego hizo Amaral, en los siguientes términos:

"Entonces, yo fui a mi oficina. La leí. Me di cuenta de lo que se trataba. Fui donde . . . a la oficina del Honorable Juez. Le dije: 'Don Fernando, tenga la bondad de ver esto, este pliego'; y entonces le pregunté que si él recordaba el incidente. Me dijo: 'Mira Juan, si eso pasó eso yo lo diría en un receso'. Yo fui allí con el fin de orientarme. Entonces, fui donde el Honorable Fiscal Grajales para orientarme también, y me dijo el Honorable Fiscal: 'Juan, busca tus libretas que eso ocurrió'. Inmediatamente que él me dijo eso yo fui a mi oficina, cogí las libretas, empecé a revisarlas. De momento yo no podía localizar el incidente. Entonces, opté por coger la primera libreta hoja por hoja hasta que llegué hasta donde encontré el incidente; y entonces cogí, puse papel en la maquinilla y lo transcribí inmediatamente. Entonces, hablé con el Fiscal, el Honorable Fiscal y le dije que yo le iba a escribir una carta al licenciado César Andréu Ribas en ciertos términos que yo le dije a él.(²)

---

(²) Cuando se interrogó a Amaral en relación con la causa de la omisión de transcribir 26 páginas de su libreta de signos taquigráficos que incluían el diálogo entre juez y fiscal, mencionado en la moción, dio la siguiente explicación:

"Cuando yo empiezo a hacer una transcripción de evidencia me voy a la Secretaría de la corte y busco el expediente original. Entonces, lo-

8. El 27 de marzo Amaral remitió por correo al abogado querellado la parte omitida de la transcripción con una carta que lee:

"Estimado señor y amigo: Le incluyo con la presente los pliegos adicionales que deben intercalarse en la Transcripción de Evidencia del caso del Sr. Marín Canales (sic), que contienen el incidente que involuntaria e inadvertidamente omití transcribir. Lo lamento profundamente porque esa omisión ha dado margen a que su señoría impróvidamente (de esto estoy seguro, pues nosotros hemos sido buenos amigos), haya consignado ciertas manifestaciones en su escrito de enmiendas. Cuando recordemos lo que hablamos en ese día 25 de enero quedará plenamente esclarecida la verdad y su señoría, con ese gesto noble que lo caracteriza, pedirá que se eliminen del récord. Mientras tanto, quedo, como siempre a sus órdenes, atto. amigo y s. s., (do) Juan Amaral." (Exh. 6 GD, Querellante.)

9. Llamado en la mañana del 3 de mayo el caso de Marín Canals a los fines de la aprobación de la transcripción de evidencia, ocurrió entre el Juez Gallardo Díaz y el abogado César Andréu Ribas el siguiente diálogo:

calizo las libretas y localizo el sitio donde empieza la vista del caso. Entonces, yo cojo y le hago un doblez a la hojita donde empieza una declaración y donde empieza la repregunta y donde termina, y así sucesivamente, para darme cuenta exacta del trabajo que yo tengo que realizar. En este caso específico del señor Miguel Ángel Marín Canals son unas cuantas libretas. Yo no podía hacer un récord de un tirón, o sea, sentarme en la maquinilla y dedicarme exclusivamente a transcribir ese récord porque en Bayamón solamente hay un taquígrafo. Tengo que ir todos los días a sala cuando hay juicio. La labor se realiza cuando no estoy ocupado en sala, la realizo los sábados o los domingos. Entonces, va progresando el trabajo; pero yo soy interrumpido en diferentes ocasiones. Bien porque tenga que ir para sala a ocupar la silla allí para trabajar o bien porque me llamen por teléfono o que los viernes los abogados necesitan sus récords expartes que se le hagan rápido. Y así sucesivamente, o porque me llamen por teléfono. Entonces, yo cojo la libreta y donde, hasta donde he llegado le doblo una hoja, y efectivamente. Yo no sé si yo dejé la libreta en esta forma así al aire, ¿ve? Cuando le hice la marca yo no sé si yo dejé la libreta en esta forma. La cuestión es que cuando fui de nuevo a transcribir que yo fui interrumpido, que fui de nuevo a transcribir, o el viento me voló las hojas esas o yo tomé un punto de partida distinto al que yo debía seguir y esa es, eso es lo que ha pasado."

"DEFENSA: Lic. César Andréu Ribas: Yo propuse unas enmiendas al récord taquigráfico, que están unidas al expediente de este caso. Su señoría recordará que el día del juicio y después de terminarse de practicar las declaraciones juradas de los policías que aparecían al dorso de la acusación, vuestro honor ordenó que se retirara el jurado y le preguntó al fiscal Grajales 'si esa era la prueba del caso'; eso fue después que presentó en evidencia el revólver y las balas. Y entonces su señoría hizo ciertas manifestaciones dirigidas al fiscal, las cuales, vuestro honor, este abogado las tomó lo más rápidamente posible en manuscrito, porque yo no soy taquígrafo, que en síntesis son las siguientes, que aparecen de la 'Solicitud de Enmiendas a la Transcripción de la Evidencia';

"LA CORTE: Hon. F. Gallardo Díaz,

"JUEZ: ¿Eso fue en ausencia del jurado?

"DEFENSA: Sí, vuestro honor. Voy a leer el incidente. '¿Ésa es toda la prueba?', y al fiscal contestarle afirmativamente, el Juez ordenó al márshal sacara al jurado de Sala, y se desarrolló un extenso diálogo entre el juez y el fiscal, más o menos en los siguientes términos: hablando el Señor Juez: '¿Usted me quiere decir que habiendo sucedido este caso en una barra ahí en Cataño, que está a dos minutos de aquí, usted tan sólo trae a declarar a los dos policías, y que usted no le ha tomado declaración ni al dueño de la barra, o encargado de la misma, ni a ningún otro ciudadano? Fíjese que yo tengo la responsabilidad de resolver uno de estos dos casos, que son felony uno y el otro misdemeanor, y esa investigación es muy deficiente. Yo cuando era fiscal en Guayama y en San Juan y se daba un caso como éste no me conformaba con lo que me dijera la policía, sino que me iba al sitio, le cogía declaración a todos los testigos y a cuanta persona pudiera haber estado presente, aunque fuera para decirme que no sabían nada del asunto. Así no me podía la defensa traer esos testigos a decir que vieron esto y aquello otro porque yo los tenía amarrados con una declaración de que no sabían nada...'

"LA CORTE: Si yo en mi vida he usado la palabra 'amarrado'...

"En este momento el taquígrafo se dirige al Hon. Juez y dice: El incidente está transcrito, y le hace entrega de su original, porque ya en 27 de marzo de 1957 les había servido copias del mismo a los abogados de las partes.

"La Corte: . . . Yo me acuerdo que hubo algo de eso.

"Defensa: Me voy a permitir vuestro honor seguir leyendo. Después el señor Grajales le contestó: 'Ésa es toda la prueba que tiene el Pueblo, y ése es el caso; yo no puedo hacer nada más.'

"Yo recibí copia de la transcripción del incidente acompañada de una carta del taquígrafo, señor Amaral, que es un funcionario para quien tengo un gran respeto, y ahora quiero decirlo públicamente, que lamento todo este incidente, y con perdón de vuestro honor quiero hacer constar públicamente, aquí, ante el foro el concepto que tengo del señor Amaral . . .

"Entonces leí la transcripción del incidente que yo he alegado estaba omitido en la Transcripción de Evidencia, y ví que el incidente transcrito por el Sr. Amaral es, más o menos, lo mismo que yo tomé en manuscrito, pero con más detalles, y yo estoy conforme con el incidente.

"Pero yo quiero decir también que yo tengo que velar por los derechos de mi representado en apelación. Por eso radiqué esa moción, vuestro honor, que acabo de leer solicitando enmiendas al récord taquigráfico.

"Después recibí la carta del Sr. Amaral, señor Juez, con la que me acompañaba las páginas 79, 79A, 79B, 80 y 81, carta en la cual el Sr. Amaral realmente me hace una protesta, y me dice lo siguiente: (Sigue la carta que aparece transcrita en la Conclusión núm. 8.)

"Defensa: *De manera, pues, que yo acepto en primer lugar que fue una omisión involuntaria por parte del Sr. Amaral. Acepto también que lo transcrito en estas páginas que el Sr. Amaral me envió con su carta es lo correcto.* Eso era todo lo que yo tenía que decir con respecto a las enmiendas. Ahora quiero decir algo con respecto al Sr. Amaral, porque quería decirle aquí delante de la corte, de sus funcionarios, del público y de los miembros del foro, que es lo siguiente *'tengo un gran concepto del Sr. Amaral como funcionario y en todos sus órdenes, es un ciudadano correcto, es un funcionario correcto y honesto* y no le había contestado su carta porque quería decirlo aquí ante el tribunal.'" Folios 3034, Ex. 3 GD, Querellante. (Bastardillas nuestras.)

10. En la transcripción de evidencia preparada por el taquígrafo Juan Amaral y que éste radicó el 7 de marzo de

1957, dicho taquígrafo incurrió en la omisión del diálogo entre juez y fiscal que, en lo pertinente, se inserta en la Conclusión núm. 3 que precede y que tuvo lugar en la tarde del 24 de enero de 1957, en ausencia del jurado, durante el juicio contra Marín Canals luego de haber anunciado el fiscal la terminación de su prueba; en ninguna forma el juez Fernando Gallardo Díaz o el fiscal Fernando Grajales Rodríguez tuvieron intervención en la comisión de esa omisión.    Exh. 6 GD, Querellante;  R. 398, 431, 469, 471 GD.

11. En el año 1942 surgió una relación de enconada enemistad personal entre el juez Fernando Gallardo Díaz y el abogado César Andréu Ribas que, con aparentes períodos de enfriamiento, ha persistido a través de los años, manifestándose en distintas formas.—Exhibit 15, págs. 57–62, GD, Querellante;  Exhibits A, B, F, J, K y L, GD, Querellado.

### Sobre el Segundo Cargo

12. Tan pronto terminó de pronunciar el abogado querellado las palabras contenidas en el último párrafo de la cita transcrita en la Conclusión núm. 9 que antecede, tomó su maletín, lo cerró, cogió su sombrero y se dispuso a salir de la sala del tribunal.   En ese momento tiene lugar el siguiente diálogo entre él y el juez Gallardo Díaz:

"LA CORTE: *Yo nunca había leído esto, ni sabía que esto había pasado, hasta este momento.   Pero veo aquí que su señoría al referirse a mí, me dice 'el Juez Fernando Gallardo', 'Sr. Juez', y a mí no me importa que no me digan 'honorable', porque yo sé que soy honorable aunque usted no lo crea . . .*

"DEFENSA: *Perdóneme la Corte . . . Yo no he venido aquí para que su señoría aprovechándose de que es juez me venga con esas cosas . . .*

"LA CORTE: *Pues yo se lo digo aquí y fuera de la corte y donde quiera . . .*

"DEFENSA: *Eso es lo que yo quiero . . . Véngase . . . véngase . . .*

"LA CORTE: *Receso.*"—Folios 30–35, Exh. 3, GD, Querellante.   (Bastardillas nuestras.)

13. Durante el diálogo anterior, el juez se encontraba sentado; el abogado Andréu Ribas de pie, frente a la mesa del secretario. Dando un manotazo sobre su escritorio, el juez decretó un receso, se puso súbitamente de pie—R. 289 GD;—giró hacia su derecha, bajó de su estrado y empezó a caminar hacia el sitio donde estaba el licenciado Andréu Ribas, quien se encontraba cerca de la mesa de los abogados del tribunal. R. 250, 323, 335 GD. Ambos se encontraban excitados y nerviosos. Entonces, el alguacil Juan Ramón Rivera Ayala, "Temiendo que pudiera ocurrir algo"—R. 552 GD—interceptó al juez Gallardo Díaz y "lo agarró por los brazos"—R. 358, 499, 882 GD—impidiéndole que avanzara. R. 525 GD. Intervinieron con el juez también el alguacil auxiliar y "un sinnúmero de abogados," que le aconsejaban que tuviera calma—R. 529, 553 GD—y lo empujaron o echaron—R. 70, 453–499 GD—hacia un pequeño pasillo que conduce al salón de jurados; en el momento en que lo acababan de entrar en ese pasillo y estando todavía cerca del dintel de la puerta que da al mismo, el juez Gallardo Díaz le dice a los que lo sujetaban: "Suéltenme, que éste no es más que un pendejo."—R. 290, 500 GD. A estas palabras el querellado César Andréu Ribas, con quien habían intervenido el Fiscal Grajales y otros abogados—R. 249 GD—contestó: "Más pendejo es usted." R. 500 GD.

14. Llevaron al juez a su oficina donde tomó una pastilla de equanil.—R. 114 GD. Al querellado Andréu Ribas lo tomó por el brazo el Fiscal Grajales, lo sentó en una butaca y luego lo llevó a fiscalía; allí le ofreció un calmante, pero no lo tomó.—R. 328 GD. De su oficina salió el juez y bajó de la planta alta del edificio hacia el sitio donde tenía estacionado su automóvil con la "idea de ir a mi automóvil y sacar el revólver del 'dash' y traérmelo", cambió de idea y regresó sin el revólver, reanudando la sesión del tribunal. R. 1115 GD. De la oficina del fiscal se fue el querellado An-

dréu Ribas para San Juan, donde atendió otros asuntos.— R. 49, 328 GD.

15. Como resultado del incidente entre juez y abogado, fueron interrumpidos por algún tiempo los procedimientos. Unos testigos declararon que la interrupción duró cuarenta y cinco minutos, R. 376 GD; otros treinta—R. 537 GD; otros veinticinco—R. 532 GD; otros "no menos de quince",— R. 362 GD.

I

▆▆▆ Por el primer cargo sostiene el querellante que el abogado César Andréu Ribas al redactar y radicar la transcrita solicitud de enmiendas al récord taquigráfico preparado por Juan Amaral a los fines del recurso de apelación en el caso de Marín Canals, observó una conducta inmoral e impropia de un abogado consistente en que: a) hizo la imputación velada de que hubo connivencia entre el tribunal y el taquígrafo para eliminar, como se eliminó de la transcripción de la evidencia el incidente ocurrido, durante la vista del caso, entre el Juez Gallardo y el Fiscal Grajales con el alegado propósito de privar al acusado del derecho de invocar como fundamento de error en la apelación las frases pronunciadas por el Juez Gallardo en dicho incidente sobre la calidad de la prueba de cargo; b) que la mencionada imputación es falsa y fue hecha por el abogado querellado sin que le constase su certeza y sin tener causa probable o fundamento alguno para creer en la verdad de la misma, y c) con la intención maliciosa de menoscabar la honradez e integridad del tribunal y del Juez, Sr. Gallardo, todo ello en violación de los deberes que el querellado, como abogado, tenía para dicho tribunal y Juez.

Considerando las conclusiones sobre los hechos que hemos formulado y las circunstancias adicionales que expondremos, a nuestro juicio, dicho primer cargo quedó plenamente comprobado. Veamos.

*a)* Después que el abogado querellado consignó en su moción sobre enmiendas los hechos esenciales para su consideración, o sean: que a los fines del recurso de apelación interpuesto por el acusado se había preparado la transcripción de la evidencia; que la misma no incluía el incidente ocurrido entre juez y fiscal que se relataba en dicha moción y que las manifestaciones vertidas por ambos funcionarios debían incluirse en esa transcripción, y así se le suplicaba al tribunal, añade, a su indicada moción, el siguiente párrafo:

"3.—Que durante el receso el abogado del acusado se acercó al Sr. Amáral, y luego en la propia oficina de éste, consiguió que se le leyeran las manifestaciones que ahora no aparecen de la transcripción, razón por la cual, tiene motivos para creer que no ha sido, ni se trata de una omisión involuntaria al transcribir sus notas sino que esas frases fueron eliminadas de la transcripción luego de conocerse por el tribunal de la intención de apelar que manifestó el acusado en corte abierta al solicitar se le fijara fianza para hacerlo."

El querellante caracteriza el contenido de ese párrafo tercero como una imputación "velada" de connivencia entre el tribunal y el taquígrafo a los fines de privar al acusado, maliciosamente, del derecho de invocar como fundamento de error, en la apelación, las frases del juez sobre la calidad de la prueba de cargo. Es claro que las palabras del párrafo constituyen tal imputación "velada". Pero es el propio querellado el que se ocupa de descorrer el velo que cubría esa imputación, y de señalar a quien él consideraba como autor real de la voluntaria omisión, en las siguientes ocasiones:

(1) Cuando declaró, bajo juramento, ante los fiscales señores Aponte y Gil, el día 13 de mayo de 1957, entre otras cosas, dijo:

"Como observo, cuando viene el récord, que faltan las páginas en cuestión, realmente al redactar la moción di la impresión de que no había sido omisión involuntaria sino obedeciendo a algún interés de alguien y lógicamente presumí que el único interesado de que no aparecieran esas manifestaciones, dichas en jui-

cio, en un caso que iba a ser apelado al Supremo, era el juez que las había dicho, ya que el señor Amaral me había dado su seguridad personal de que todo lo que había ocurrido lo iba a transcribir y había tenido oportunidad de enseñarle lo que yo había tomado a manuscrito. (Exh. 19, pág. 19, Querellante.)

"

"Entiendo que ahí estoy diciendo yo al juez que, luego de manifestar el acusado que iba a apelar, el juez se dio cuenta que estas frases gratuitas de la calidad de la prueba de cargo iban a ser el primer fundamento para que yo revocara su sentencia. Eso es todo el abuso que yo atribuyo. (Exh. 19, págs. 20–21, Querellante.)

"

"FISCAL:

"¿En cuanto al incidente de las enmiendas al récord taquigráfico, debemos entender que el compañero estaba bajo la impresión de que eso no había sido una omisión involuntaria sino deliberada?

"TESTIGO:

"Yo tenía la convicción moral de que el señor juez Gallardo instruyó, como en otras ocasiones, de que no pusiera algo de lo que dijo en Corte." (Exh. 19, págs. 24–25, Querellante.)

(2) Cuando replica a los cargos que se le formulan, en parte expone:

". . . alega el querellado que tenía fundados motivos para creer como creyó de buena fe, que tal involuntaria omisión tuvo lugar *no a iniciativa* del taquígrafo Sr. Juan Amaral . . ." (Bastardillas nuestras.)

(3) Cuando declara, bajo juramento, ante nos, en parte, dice:

"R. Yo le voy a ser franco: le diría que no sería una gran desconfianza. Tenía mi pequeña desconfianza, no gran desconfianza, compañero. Pequeña desconfianza por todo lo que sabía. Yo no formo juicio así a lo ligero, ni na' de eso. Todas esas cosas me hicieron creer que quizás o el señor Amaral por su propia cuenta para no perjudicar al señor juez que lo llevó allí y que es amigo de tantos años o el señor fiscal mismo para que no apareciera en el Tribunal Supremo en una apelación la opinión que le merecía al señor Juez Gallardo o cualquier persona interesada pudiera lograr que eso no apareciera el día en que eso viniera aquí . . . (R–75 y 76 GD.)

"

"R. Pues, lo que había pasado a mi juicio, era que alguien en el tribunal—ya le dije quiénes podían haber sido—pues, esto es: o que Amaral no se ha atrevido poner esto. Segundo: Puede ser que el señor juez le haya dicho: 'Aquello lo dije yo "off the record", no lo pongas'. Puede ser que el Fiscal Grajales como es un muchacho joven y nuevo que está empezando no haya querido que esto vaya al Tribunal Supremo, las manifestaciones de un juez de experiencia como el señor Gallardo sobre la calidad de su investigación. Pensé muchísimas cosas, sin llegar a ninguna conclusión." (R. 87 GD.)

(4) Y cuando redacta su alegato, en la parte pertinente, expone:

"Al querellado le constaba, pues, que *el juez y el taquígrafo de Bayamón eran perfectamente capaces de omitir intencionalmente de una transcripción algo que al juez no le conviniera*, y que de hecho se habían asociado y puesto de acuerdo para hacerlo en por lo menos una ocasión anterior." (Pág. 11, bastardillas nuestras.)

"La omisión fue voluntaria, por haber sido exprofesa. Y en la omisión había y hay base para creer que tuvo intervención el juez." (Pág. 18.)

*b*) La grave imputación que hizo en su moción el querellado no quedó comprobada. No existe en la evidencia practicada el más pequeño principio de prueba legal, eficaz y confiable, que nos pueda producir una certeza moral o la convicción de que el juez o el fiscal ordenaran, aconsejaran o insinuaran al taquígrafo que omitiera en su transcripción parte alguna de lo dicho en sala. El único autor responsable de la omisión, lo fue el taquígrafo Amaral.(³) Así éste

---

(³) El querellado se pronunció así, en la mañana del 3 de mayo mientras se dirigía al tribunal: ". . . yo acepto en primer lugar *que fue una omisión involuntaria por parte del Sr. Amaral*. Acepto también que lo transcrito en estas páginas que el Sr. Amaral me envió con su carta es lo correcto . . . Ahora quiero decir algo con respecto al Sr. Amaral, porque quería decirle aquí delante de la corte, de sus funcionarios, del público y de los miembros del foro, que es lo siguiente: 'tengo un gran concepto del Sr. Amaral como funcionario y en todos sus órdenes, es un ciudadano correcto, es un funcionario correcto y honesto . . ." Exh. 3 GD, folio 34, Querellante. (Bastardillas nuestras.)

lo consigna en su carta al querellado del 27 de marzo y lo admitió, bajo juramento, ante los fiscales y ante nos.

El querellado nunca tuvo la certeza o el conocimiento claro y seguro de que el juez o el fiscal intervinieran en la comisión de la omisión, ni causa probable o fundamento alguno para creer en la verdad de la imputación que hizo en su moción. Él presumió que "el único interesado de que no aparecieran esas manifestaciones, dichas en juicio, en un caso que iba a ser apelado al Supremo, era el juez que las había dicho."— Exh. 19, pág. 19, Querellante. (⁴)

Como él mismo declara, al recibir la transcripción, por primera vez, examinarla y notar la falta del diálogo entre juez y fiscal, su primera impresión fue: "Mira, tal y como yo lo pensé."—R. 86 GD—Empezó entonces el desfile de ideas por su mente en busca de la persona responsable de la omisión. Enfoca su pensamiento hacia "alguien en el tribunal." Piensa "que Amaral no se ha atrevido poner esto."

---

(⁴) El querellado dio diversas explicaciones en torno a su intención o pensamiento al redactar la moción sobre enmiendas. En el curso de su declaración ante nos, entre otras cosas, se le preguntó y contestó lo siguiente:

"Habiendo manifestado el compañero que en este párrafo tercero bajo el vocablo 'tribunal' en 'minúscula' estaban incluídos el juez que presidía la sala, pregunto, ¿porqué el día 3 de mayo y cuando ofrece explicaciones, satisfacciones, simplemente dirige las mismas al taquígrafo y no incluye al juez en esas explicaciones que daba?

"R. Ya le digo al compañero que del escrito de apelación mío se enteraron ese día el señor juez que fijó fianza, el señor fiscal que fue notificado del mismo, el taquígrafo que recibió una orden para transcribir la evidencia y entonces, mis enmiendas van dirigidas a una persona que mecánicamente va a hacer una labor, esa persona me suple lo que está omitido, me escribe una carta que yo entiendo que debo contestarla—pude haberlo hecho por escrito, preferí hacerlo personalmente—pues no tenía que darle excusas al Hon. Juez Gallardo, porque el Hon. Juez Gallardo en ningún momento hasta el momento de este incidente el señor Gallardo me ha dicho a mí: 'Usted puso esto y me doy yo por aludido'. Si él me llega a decir allí: 'Mire, ¿cuando usted dijo esto aquí me incluye a mí?' —'No, señor juez'—y me voy.

"P. En otras palabras, su explicación es sencilla, es que como no le pidió a usted explicación o satisfacción el Hon. Juez Gallardo, usted entendía que no tenía que dárselas?

Piensa que "puede ser que el señor juez le haya dicho 'Aquello lo dije yo *off the record,* no lo pongas.' " Piensa que el Fiscal Grajales "como es un muchacho joven y nuevo que está empezando no haya querido que esto vaya al Tribunal Supremo, las manifestaciones de un juez de experiencia como el señor Gallardo sobre la calidad de su investigación." Y rechaza todas esas ideas porque él mismo nos declara finalmente: "Pensé muchísimas cosas, sin llegar a ninguna conclusión."—R. 87 GD.

Cuando se interroga al abogado querellado sobre cuál era su pensamiento y actitud mental, no ya en el momento de recibir la transcripción y notar la falta del diálogo, sino en el momento en que redactó su moción sobre enmiendas, declaró:

"R. Yo le expliqué esta mañana, compañero, que mi actitud mental al recibir la transcripción incompleta, pues, obedeció a la sorpresa natural de una persona que había hablado sobre este particular con el señor Amaral. Originalmente, pues, sur-

---

"R. *Como no iba dirigido a él tampoco,* no se las tenía que dar, igual, que no se las tenía que dar al señor Fiscal Grajales.

"P. ¿A usted de haberle pedido esas explicaciones el Hon. Juez Gallardo, usted se las hubiera dado?

"R. Igual que si me dice el señor Grajales: ¿'Andréu, tú te referías a mí en esto?' le digo: 'No, señor.'

"P. O sea, que el 3 de mayo de 1957, usted estaba convencido de que el Hon. Juez Gallardo no había tenido que ver nada con esas omisiones de ese incidente?

"R. Yo acepté como buena la explicación que me dio el señor Juan Amaral en su carta de 27 de marzo y me ví obligado a ir como un caballero allí y decir muchísimas cosas que dije de él en aquel lugar.

"P. En otras palabras, el 3 de mayo de 1957, *usted estaba convencido de que el Hon. Juez Gallardo no había tenido nada que ver con la omisión de ese incidente* que apareció luego con los pliegos que le añadió el señor Juan Amaral?

"R. *Estaba convencido de ello porque el señor . . . nunca dije que era él.* Y además, porque el señor Juan Amaral asumió la responsabilidad cuando me dice: 'Yo omití involuntariamente'. Cuando él asume la responsabilidad ya yo no tengo derecho a seguir insistiendo en que sea nadie más. *Ni nunca lo dije que fue el señor juez. Mire, si yo llego a saber que es el señor juez, a mí se me sobra el valor cívico para decir:* 'El señor juez Gallardo lo eliminó'. Pero yo *no le digo esa imputación a nadie y menos a un juez."*—R. GD, págs. 100–103. (Bastardillas nuestras.)

gieron en mi mente muchísimas cosas. Me chocaba que una cosa tán larga en un taquígrafo de la experiencia de Amaral quien me había dicho que sí que estaba allí, que me había leído parte . . . que me había admitido cuando yo había ido que todo estaba allí que iba a venir, que no me preocupara, pues me chocaba eso y naturalmente, *reaccioné, como no tenía la certeza moral de que hubiera sido cosa de Amaral, si había sido una solicitud del Fiscal Grajales para que eso no viniera aquí, si había sido una indicación del Hon. Juez,* pues, dije: 'No voy a hacer nada más que una moción haciendo constancia de que yo tengo lo que pasó ese día y pidiéndole a la corte que me dé oportunidad de probarlo.' "—R. GD, pág. 204. (Bastardillas nuestras.)

También nos declaró que si él "hubiera creído o querido imputarle al Sr. Gallardo que él fue el que eliminó del récord, yo digo expresamente 'el señor Gallardo eliminó del récord' pero no lo hubiera hecho nunca sabiendo que él es mi enemigo personal. Él nunca lo hubiera dicho si no hubiera tenido una prueba tan robusta que hasta él mismo [Gallardo] hubiera tenido que admitir que era él."—R. 205 GD.

Bajo estas circunstancias resulta manifiestamente correcta la afirmación del querellante de que el abogado querellado hizo aquella imputación sin tener causa probable o fundamento legítimo alguno para creer en la verdad de la misma. La situación constante de enemistad entre éste y el juez, lo que él presumió o las ideas que "le golpeaban la cabeza", su actitud de desconfianza, el conocimiento propio o por información de una sola parte que dicho abogado tuviera de que en anteriores ocasiones Amaral había omitido incluir en otras transcripciones determinadas manifestaciones del mismo juez—omisiones cuya naturaleza, origen, propósitos, resultados y personas responsables nunca se determinaron—no pueden considerarse como fundamento serio o base suficiente para creer, ni para inferir, que, efectivamente, el juez Gallardo Díaz o el fiscal Grajales, o ambos, en connivencia con el taquígrafo, hizo o hicieron excluir de

la transcripción preparada en el caso de Marín Canals el diálogo de referencia.

c) Lo manifiestamente infundado de esa grave imputación de deshonestidad se desprende, en primer término, de la ausencia de un hecho cierto o de una causa probable para creer en la verdad de la misma; en segundo término, de que era completamente innecesaria a los fines de obtener que se completara el récord—el propio querellado admitió que "Quizás no hacía falta,"—R. GD, pág. 207; en tercer término, porque el querellado la estimó, a pesar de que no tenía certeza moral de que era verdadera, el mejor o el más adecuado método de obtener que se transcribieran las páginas que faltaban de la transcripción. Cf. R. 916 GD.

Una injustificada imputación de esa naturaleza, por la cual principalmente resultaban acusados el juez y el taquígrafo del tribunal de haber conspirado para preparar una transcripción de evidencia falsificada en perjuicio de un acusado apelante, [5]—hechos delictivos, artículos 62, 128 y 146, Código Penal—formulada conscientemente [6] por un abogado de la experiencia y habilidad profesionales del querellado, constituye causa suficiente para disciplinarlo, conforme al estatuto y a los Cánones de Ética Profesional. [7]

---

[5] A la página 17 de su alegato afirma el querellado: "Era obvio que el querellado no estaba en plan de tolerar falsificaciones de la transcripción de evidencia. Su moción lo indicaba con toda claridad."

[6] Declaró el querellado que al redactar su moción sobre enmiendas actuó "conscientemente" en cuanto al significado de sus términos.— R. 206 GD. En su alegato, página 11, expuso:

"Al querellado le constaba, pues, que el juez y el taquígrafo de Bayamón *eran perfectamente capaces de omitir intencionalmente* de una transcripción algo que al juez no le conviniera, y que de hecho se habían asociado y puesto de acuerdo para hacerlo en por lo menos una ocasión anterior. Le constaba al querellado esto, porque ambos hermanos Cintrón Ayuso *se lo habían dicho* para la fecha en que ocurrió esa omisión, y todo ello con anterioridad a la otra omisión del incidente en el citado proceso criminal." (Bastardillas nuestras.)

[7] "El abogado que fuere culpable de engaño, conducta inmoral (malpractice) ... en conexión con el ejercicio de su profesión ... podrá ser suspendido o destituído de su profesión por la Corte Suprema de Puerto Rico."—4 L.P.R.A. sec. 735. Bajo nuestra facultad inherente para

■ Debe considerarse justa causa para imponer sanciones disciplinarias toda imputación, oral o escrita, de la comisión de hechos inmorales o ilegales, formulada por un abogado, que no esté respaldada (*warranted*) por evidencia competente, que tienda a degradar o a afectar la dignidad, honorabilidad e integridad de los tribunales o de sus funcionarios o que puedan debilitar o destruir el respeto a o la confianza pública en los mismos. 5 Am. Jur. *Attorneys at Law*, secs. 265–266; 7 C.J.S. *Attorney and Client*, sec. 23, págs. 752, 753; Anotación en 14 A.L.R. 868–871; 6 Cal. Jur. 2d sec. 85. Véanse: *In re Gross*, 177 Atl. 767 (1935); *Attorney General* v. *Nelson*, 249 N.W. 439, 444 (1933); *In re Huppe*, 11 P.2d 793, 797 (1932); *In re Troy*, 111 Atl. 723 (1920); *In re Hilton*, 158 Pac. 691 (1916); *Pittsburgh etc.* v. *Muncie, etc.*, 77 N.E. 941, 942 (1906); *In re Philbrook*, 105 Cal. 471, 475 (1895).

■■ El derecho a ejercer la profesión de abogado no es un derecho adquirido, sino un privilegio; la obligación que

determinar quiénes pueden ejercer como abogados en nuestros tribunales podemos desaforar a todo miembro del foro que no sea digno de serlo. —*In re Abella*, 67 D.P.R. 229, 238 (1947); *In re Bosch*, 65 D.P.R. 248, 251 (1945); *In re Arroyo Rivera*, 63 D.P.R. 796, 798 (1944).

El Canon I lee así:

"*Deberes del Abogado para con los Tribunales.*—Es deber del abogado observar hacia el tribunal una actitud respetuosa, no a beneficio del que entonces desempeñare el cargo de Juez, sino para dar prestigio al cargo mismo y sostener su capital importancia. Los jueces, que no siempre están en libertad de defenderse a sí mismos, tienen derecho preferente a ser defendidos por los abogados contra ataques y críticas injustas. Cuando existen fundados motivos de quejas graves contra funcionarios judiciales, es el deber y el derecho del abogado someter sus cargos a las autoridades competentes. Tan sólo así serán favorecidos dichos cargos, y la persona que los formule recibirá la debida protección."

En lo pertinente, el Canon 22 dice:

"*Sinceridad y Honradez.*—La conducta del abogado ante el tribunal y sus compañeros debiera estar caracterizada por su sinceridad y honradez.

".     .     .     .     .     .     .     .

"No es profesional ni honorable no ajustarse a la sinceridad de los hechos . . . , al redactar affidavits u otros documentos o al presentar las causas." Cf. *In re Disdier*, 70 D.P.R. 453 (1949); *In re Longchamps*, 65 D.P.R. 468 (1945).

asume el abogado no consiste simplemente en obedecer nuestra Constitución y los estatutos en vigor; consiste también, como parte consustancial de esa obligación, en el deber de mantener, en todo tiempo, el correspondiente respeto a los tribunales de justicia y a todo funcionario judicial, sin menoscabo de su derecho a sostener una defensa vigorosa y a criticar con motivo fundado y de manera respetuosa la conducta de los funcionarios judiciales.

■ La crítica judicial sana y oportuna es un medio necesario y efectivo para mantener a los jueces alertas y atentos al estricto cumplimiento de sus funciones. Pero no debe traspasar los linderos de la verdad, la honradez y la corrección en el curso de su crítica porque no hay nada que tienda más a destruir el justo balance de la conciencia judicial y a deteriorar y obstaculizar la imparcial y recta administración y el libre curso de la justicia que una crítica falsa, injustificada y viciosa. Por otro lado, como reconoce nuestro Canon 15, "No hay nada que cree o anime con mayor certeza el prejuicio popular contra los abogados como una clase determinada, y que prive a la profesión de la amplia estimación popular y de la confianza pertinente al debido cumplimiento de sus deberes, como las falsas alegaciones. . . ."— Cf. *Ethics of the Bench and Bar*, págs. 448–457, de Frederic C. Hicks; *Legal Ethics*, págs. 69–79, de Henry S. Drinker.

Dijimos en el caso de *Cordero* v. *Rivera*, 74 D.P.R. 586, 609 (1953):

"Por el sitio que ocupan en la sociedad y por su condición de funcionarios de los tribunales, los abogados deben ser cautelosos al hacer a un Juez imputaciones de tal magnitud y alcance, [atribuir error en la apreciación de la prueba 'con mente prevenida y con pasión y prejuicio'] y ello solamente si están convencidos, en lo más profundo de sus conciencias—a la vez no prevenidas—de la certeza de sus afirmaciones, y entonces para exigir la verdadera responsabilidad que tan grave desviación del deber conlleva."

██ La evidencia ofrecida por el querellante sostuvo también el segundo cargo de la querella que se refiere a la conducta del querellado durante el incidente del día 3 de mayo de 1957. No hay duda que en ese incidente el querellado observó una conducta desafiante y desdeñosa hacia el juez que presidía la vista y en detrimento de la dignidad, el prestigio y el buen nombre del tribunal. Es evidente que ningún abogado puede llegar a estos extremos por el hecho de sentirse molesto por una actuación o expresisón de un juez.(8) Aunque a los jueces compete hacer todo cuanto esté a su alcance para mantener la dignidad y el decoro de los procedimientos judiciales, no podemos permitir que una transgresión momentánea de ese deber judicial se convierta en excusa para que un abogado, yendo mucho más allá de lo que las circunstancias requieren, increpe al juez y lo desafíe a pelear. A los jueces y abogados, como los protagonistas principales en el drama de la justicia, les toca preservar la indispensable dignidad de los procedimientos mediante la aplicación diaria de normas de urbanidad y respeto mutuo. Como hasta el presente, este Tribunal ha de estar atento a la conducta de jueces y abogados y, cuando las circunstancias lo demanden, utilizará sus poderes disciplinarios para impedir que esa conducta lesione el decoro y la solemnidad que deben existir en las salas de justicia.

Luego de considerar detenidamente todas las circunstancias de los dos cargos, incluyendo la conducta del juez

---

(8) Es innecesario resolver, al considerar este segundo cargo, si la actuación del querellado constituye o no "conducta inmoral (*malpractice*)" de acuerdo con la disposición legal aplicable. Las facultades de este Tribunal para disciplinar a los miembros de su foro no se derivan de la ley. Constituyen un poder inherente, *In re Pagán*, 71 D.P.R. 761 (1950), que nos permite disciplinar a un abogado por cualquier conducta indigna. *In re Abella*, 67 D.P.R. 229 (1947). No nos cabe duda de que la conducta del querellado en el incidente del 3 de mayo de 1957 fue "impropia de un abogado y en detrimento del prestigio, la dignidad y el buen nombre del Tribunal y de la administración de la justicia" según reza del cargo que se radicó en su contra. Constituyó, también, una violación del Canon 1 de los de Ética Profesional.

que entendió en los procedimientos, somos de opinión que *procede suspender al querellado César Andréu Ribas del ejercicio de la profesión de abogado en nuestra jurisdicción por un período de seis meses.*

Los Jueces Asociados señores Pérez Pimentel, Belaval y Saldaña no intervinieron.

Opinión del JUEZ ASOCIADO SR. SANTANA BECERRA disintiendo en cuanto al segundo cargo formulado.

Concurro en la opinión del Tribunal sobre el primer cargo. La evidencia no demuestra que el querellado incurriera en conducta inmoral en lo referente a los actos ocurridos en corte abierta el 3 de mayo de 1957, objeto del segundo cargo, aún cuando es incuestionable que incurrió en conducta impropia. No obstante las expresiones del Juez en torno al trato que según él debía merecer del querellado, el comportamiento que éste observó ante tales expresiones fue irrespetuoso y pudo merecer de inmediato acción correctiva como desacato al tribunal. Pero aún así, no creo que tal comportamiento que, según expreso en mi opinión de esta misma fecha en el caso seguido contra el Juez Superior Hon. Fernando Gallardo Díaz, se produjo al calor de un incidente surgido de momento, aisladamente considerado y a la luz de las demás circunstancias probadas, dé lugar, a mi juicio, al castigo más severo de una suspensión del querellado en el ejercicio de su profesión.

Considero que el abogado César Andréu Ribas debe ser suspendido del ejercicio de su profesión por la imputación velada al Tribunal, carente de verdad, de haber intentado adulterar un récord en apelación. Esa es una imputación seria que tiende a destruir la confianza pública en la honrada, honesta y eficaz impartición de justicia. El magistrado que incurriere en tal práctica no debe por un momento más ejercer la delicada misión que la ciudadanía puso en sus manos,

pero el abogado que impute tal cosa, y no sea cierto, ha incurrido en una de las más censurables prácticas malsanas de la profesión.

Voto separado del JUEZ ASOCIADO SR. BELAVAL, inhibiéndose.

Al finalizar las vistas separadas de las dos querellas presentadas contra el Honorable Juez, señor Fernando Gallardo Díaz y el Lic. César Andréu Ribas, abandoné la Sala de Sesiones de este Tribunal, completamente convencido que estábamos ante un caso anodino, uno de esos casos dramatizados hasta lo absurdo, y que si alguna corrección disciplinaria o censura había que imponer, más con ánimo ejemplarizador que riguroso, era por haberse prestado un juez y un abogado a una tarea de mutuo desprestigio, sin tomar en cuenta el daño que tal conducta irremediablemente tendría que inflingirle a sus respectivas magistraturas. Era entonces mi criterio, que tratándose de un caso intrascendente, se debía disponer de ambas querellas mediante una simple resolución, en uno u otro sentido.

Cuatro o cinco días antes de la resolución de la querella contra el Honorable Juez, señor Fernando Gallardo Díaz, se hizo evidente y definitiva la disparidad de criterio entre mis compañeros jueces, en cuanto a los aspectos más importantes de la querella. Comprendiendo que mi voto decidiría la cuestión en una forma o en otra, estudié el caso con ese rigor adicional que exige la ponencia individual o la opinión de mayoría.

El examen del alegato de los abogados del Lic. César Andréu Ribas, me convenció que para contestar los fundamentos del alegato de este querellado, se haría necesario aplicar, revocar, distinguir, explicar o modificar la doctrina sentada por este Tribunal en el caso de *In re González Blanes*, 65 D.P.R. 381, (1945) (De Jesús), en el cual resultaba yo ser el juez aludido; un caso que hoy no tiene para mí otro

interés, que ese pálido interés que dejan ciertos hechos dolorosos al desdibujarse en el fondo del tiempo, pero vigente en nuestro cuerpo doctrinal. A pesar de la corrección desplegada por los abogados del Lic. César Andréu Ribas en la exposición de su argumento, y la pulcritud con que se planteaba la aplicación del caso a los hechos de la querella contra el Lic. Andréu Ribas, para mi conciencia estaba ante una moción de inhibición implícita. Estando las dos querellas ventiladas, tan relacionadas la una con la otra, no me pareció conveniente a los mejores intereses de este Tribunal, hacer uso de la regla de la necesidad, y participar en la decisión de una e inhibirme en la otra.

A la mañana siguiente, le comuniqué a mis compañeros jueces mi imposibilidad de participar en la decisión de ninguna de las dos querellas, y las razones que tenía para ello. Que estas razones no se hicieran constar en la resolución de la querella contra el Juez Gallardo, no altera el problema de conciencia. Por las mismas razones, tampoco participaré en la resolución de este caso.